UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13 CR 737 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| JAMESON HAMLIN | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO THE COMPASSIONATE RELEASE STATUTE, 18 U.S.C. § 3582(c)(1)**

For the reasons set forth below, defendant's motion should be denied based on his failure to show that extraordinary and compelling reasons warrant a sentence reduction. While defendant suffers from a medical condition that makes him more susceptible to complications from COVID-19, that condition does not warrant his release based on the 3553 factors, especially given that defendant recently refused the COVID-19 vaccine.

## I. Background

### A. Offense Conduct and Procedural History

As he admitted in his plea agreement, from December 2012 through May 2013, defendant sold wholesale quantities of heroin and cocaine. Dkt. 26 at 6. At the time of his arrest, officers found over 100 grams of heroin in defendant's bedroom. *Id.* at 5. He had a loaded pistol under his mattress in that same bedroom. *Id.*

Defendant was arrested pursuant on a criminal complaint in June 2013 and was ordered detained pending trial. He was charged by indictment with one count of possessing with intent to distribute 500 grams or more of cocaine, one count of

possessing with intent to distribute 100 grams or more of heroin, one count of possessing with intent to distribute heroin, possessing a firearm in furtherance of a drug trafficking crime, and using a telecommunications facility in furtherance of a drug crime. Dkt. 1.

Defendant pled guilty to possessing 500 grams or more of cocaine and possessing a firearm in furtherance of a drug trafficking crime. Dkt. 26. He was sentenced to 150 months' imprisonment. Dkt. 44.

Defendant is currently serving his sentence at FCI Allenwood. According to BOP's website, defendant's projected release date is March 24, 2024. He thus has approximately 38 months of his sentence remaining to be served.

### B. The BOP's Response to COVID-19

As reported on the BOP's website, in January 2020, the BOP began a course of action to respond to the spread of COVID-19.[1] Phase One of this course of action included the creation of an agency task force working in conjunction with subject matter experts from the Center for Disease Control and Prevention ("CDC") and the World Health Organization to review guidance about best practices to mitigate transmission. *Id.* On March 13, 2020, as part of Phase Two of the course of action, the BOP began implementing various measures to mitigate the spread of the virus. These measures included suspending social visits, in-person legal visits, all inmate

[1] Federal Bureau of Prisons COVID-19 Action Plan, March 13, 2020, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited Jan. 19, 2021).

movement, and staff travel. The BOP also began implementing procedures to quarantine and screen inmates and staff for the virus, which included screening all newly arriving inmates for exposure risk factors and symptoms, quarantining asymptomatic inmates with exposure risk factors, and isolating and testing symptomatic inmates with exposure risk factors. *Id.*

Subsequent phases of the BOP's response included the authorization of inmate movement in order to avoid overcrowding at BOP facilities. However, such movements were limited to inmates who had been in custody for more than fourteen days and who had been subjected to exit screening to ensure that the prisoner had no COVID-19 symptoms (fever, cough, shortness of breath) and a temperature less than 100.4° F.[2] Subsequent phases of the course of action included the quarantine and isolation of all new inmates with asymptomatic inmates being quarantined for fourteen days and symptomatic inmates being isolated until testing negative for COVID-19, modifying operations to maximize social distancing, the maximization of telework for staff members, and conducting inventory reviews of all cleaning and medical supplies to ensure ample supplies were on hand and ready to be distributed as necessary at BOP facilities.[3]

---

[2] Updates to BOP COVID-19 Action Plan, March 19, 2020, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited Jan. 19, 2021).

[3] Bureau of Prisons Update on COVID-19, March 24, 2020, https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (last visited Jan. 19, 2021).

On April 1, 2020, as part of Phase 5 of its COVID-19 action plan, the BOP secured all inmates to their assigned cells or quarters to decrease the spread of the virus.[4] On April 13, 2020, as part of Phase 6 of its COVID-19 action plan, the BOP continued to secure all inmates to their assigned cells or quarters to decrease the spread of the virus.[5] Thereafter, on May 18, 2020, the BOP extended the implementation of Phase 7 of its COVID-19 plan until June 30, 2020.[6] Phase 7 extends all measures from Phase 6, including measures to contain movement and decrease the spread of the virus.

On August 5, 2020, the BOP announced Phase 9 of its COVID-19 plan, which extended its previous safety measures through and including August 31, 2020.[7] On September 2, 2020, the BOP announced that non-contact, socially distanced in-person social visitations would re-commence at certain BOP facilities.[8] Phase 9 continues to be in effect, with modifications as updated on November 25, 2020, including the

---

[4] COVID-19 Action Plan: Phase Five, March 31, 2020, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Jan. 19, 2021).

[5] COVID-19 Action Plan: Phase Six, April 13, 2020, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last visited Jan. 19, 2021).

[6] Bureau of Prisons COVID-19 Action Plan: Phase Seven, May 20 2020, https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp (last visited Jan. 19, 2021).

[7] Federal Bureau of Prisons, "Coronavirus (COVID-19) Phase Nine Action Plan," August 5, 2020, https://prisonology.com/wp-content/uploads/2020/08/COVID-19-Phase-9-COVID-Action-Plan.pdf (last visited Jan. 19, 2021).

[8] Bureau to Resume Social Visitation, September 30, 2020, https://www.bop.gov/resources/news/20200902_visitation.jsp (last visited Jan. 19, 2021).

continuation of non-contact, socially distanced in-person visitations, where possible while maintaining the safety of our staff, inmates, visitors, and communities.[9]

Very recently, the BOP has begun administering vaccines to inmates. On January 4, 2021, the BOP issued updated Covid-19 Vaccine Guidance.[10] The guidance states it is intended to "provide direction on use of the COVID-19 vaccine for all adults who meet the criteria established by the Bureau of Prisons (BOP), with guidance from the Advisory Committee on Immunization Practices (ACIP) and the Centers for Disease Control and Prevention (CDC). . . . The goal of this guidance is to promote vaccine use as a means of controlling pandemic transmission of SARS-CoV-2 (the virus that causes COVID-19) and reducing morbidity and mortality from this infection."

Specifically with respect to the defendant, defendant's BOP medical records reflect that, on January 6, 2021, defendant was offered a COVID-19 vaccine, but he refused it. Ex. A at 89 and 125 (signed refusal of the vaccine).

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

---

[9] BOP Modified Operations, Updated November 25, 2020, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Jan. 19, 2021).

[10] https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf (last visited Jan. 11, 2021).

## II. ARGUMENT

As set forth below, the defendant has failed to satisfy the statutory criteria for relief under 18 U.S.C. § 3582(c)(1)(A)(i) because he has failed to demonstrate that extraordinary and compelling reasons warrant his release.

### A. Legal Standard

The First Step Act grants courts the authority to grant a request for compassionate release after a defendant has exhausted administrative remedies for making such a request. As amended by Section 603(b) of the First Step Act, Pub. L. 115-391, Title 18, United States Code, Section 3582(c)(1)(A) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a reduction; or
> >
> > (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Direct of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.*

Under this statute, in addition to finding "extraordinary and compelling" reasons for the reduction, the Court must find that a sentence reduction is consistent with applicable policy statements issued by the U.S. Sentencing Commission and the sentencing factors set forth in 18 U.S.C. § 3553(a).

**B. Defendant has exhausted administrative remedies.**

According to 18 U.S.C. § 3582(c)(1), a defendant is free to bring a motion for compassionate release after he has exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf, or 30 days have elapsed since the receipt of such a request by the warden of the defendant's facility, whichever is earlier.

Here, defendant submitted a request for a reduction in sentence on July 30, 2020. Dkt. 50, Ex. F. It was denied on August 10, 2020. *Id.* Because more than 30 days have elapsed since defendant's request, he has satisfied the statute's exhaustion requirement.

**C. Defendant has not established that extraordinary and compelling reasons warrant a reduction of his sentence.**

As set forth below, defendant has not established that extraordinary and compelling reasons warrant his immediate release.

**1. Defendant has not established that extraordinary and compelling reasons warrant a sentence reduction.**

Pursuant to Congress's directive, prior to the enactment of the First Step Act, the Sentencing Commission promulgated USSG § 1B1.13, which sets forth the Sentencing Commission's policy statement with respect to § 3582(c)(1)(A). Consistent with § 3852(c)(1)(A)(i), § 1B1.13 provides that a court may reduce a term of imprisonment, after considering the § 3553(a) factors, if three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) the reduction is consistent with the factors set forth in 18 U.S.C. § 3553, to the extent relevant. U.S.S.G. § 1B1.13.

As Congress expressly directed, the Sentencing Commission issued policy statements defining the "extraordinary and compelling reasons" that might warrant a sentence reduction under § 3582(c)(1)(A)(i). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."). *United States v. Saldana*, 807 F. App'x. 816, 819 (10th Cir. 2020).

Application Note 1 to Guideline § 1B1.13 limited the "extraordinary and compelling reasons" for which a sentence reduction is appropriate to the following particular circumstances:

> 1. The defendant suffers from a "terminal illness" or his physical or mental condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13 cmt. n.1(A).
>
> 2. The defendant is at least 65 years old, experiencing a serious deterioration in physical or mental health because of the aging process, and has served the lesser of 10 years or 75% of his sentence. *Id.* § 1B1.13 cmt. n.1(B).
>
> 3. The defendant's family circumstances include either the death or incapacitation of the caregiver of the defendant's minor child or minor children or the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. *Id.* § 1B1.13 cmt. n.1(C).
>
> 4. "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 cmt. n.1(D).

Guideline § 1B1.13, cmt. n. 1.

In *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020), the Seventh Circuit recently held that, because Guideline § 1B1.13 has not been amended following the enactment of the First Step Act, "the Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release." *Id.* at 1182. Therefore, *Gunn* held, district courts are free to consider motions for a sentence reduction on grounds other than the categories of extraordinary and compelling reasons listed in Guideline § 1B1.13, as limited by the statute itself. However, the Court pointed out that

> [t]he substantive aspects of the Sentencing Commission's analysis in §1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks

> an appellate holding that judicial discretion has been abused.

*Id.* Therefore, Guideline § 1B1.13 remains instructive (although according to *Gunn* not exhaustive) in determining the meaning of the term "extraordinary and compelling reasons" for purposes of § 3582(c)(1)(A)(i).[11]

Defendant argues that the ongoing pandemic, together with his medical condition, constitute and extraordinary and compelling reason warranting a sentence reduction in his case. Medical records confirm that defendant suffers from type 2 diabetes, obstructive sleep apnea, and hypertension. Defendant also claims to suffer from congestive heart failure, but according to his medical records, his recent cardiac exams were normal. Ex. A at 50–51 and 139–40. Only one of the medical conditions from which defendant suffers—type 2 diabetes—is identified in current CDC guidance as increasing the risk of severe illness from COVID-19. [12] The guidance does not identify sleep apnea as such a condition. With respect to hypertension, the

[11] The government argued in *Gunn* and in numerous other cases that Guideline § 1B1.13 is binding on the district court in the context of motions for compassionate release filed by the defendant, and that the court lacks authority to grant relief under the statute on bases other than those enumerated in the application notes that accompany § 1B1.13. This argument is now foreclosed by *Gunn*. The government preserves for potential further review the argument that *Gunn* was wrongly decided, and that a sentence reduction may be granted under § 3582(c)(1)(A)(i) only where the defendant has established an extraordinary and compelling reason, as defined by Application Notes 1(A) through 1(C) to Guideline § 1B1.13.

[12] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Jan. 21, 2021).

guidance states that, based on the limited data and information that is available, individuals with hypertension *might* be at increased risk.[13]

In light of the COVID-19 pandemic, and the fact that, as confirmed by medical records, defendant presents with a medical condition identified by the CDC as a COVID-19 risk factor, specifically type 2 diabetes, the government agrees that defendant has established that he suffers from "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," *see* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), in that type 2 diabetes substantially diminishes defendant's ability to provide self-care against serious injury or death as a result of COVID-19, within the environment of a correctional facility.

According to the BOP, although FCI Allenwood Low, the facility where defendant is housed, has experienced a substantial number of COVID-19 cases, there are currently 2 inmates and 16 staff members at the facility with positive COVID-19 cases (and 259 inmates and 2 staff members who have recovered from the virus).[14] These numbers reflect that BOP efforts to limit and control the spread of the virus have had a positive impact.

---

[13] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Jan. 21, 2021).

[14] https://www.bop.gov/coronavirus/ (last visited Jan. 22, 2021).

More importantly, by refusing a vaccine, defendant has impeded BOP's efforts to protect him from contracting COVID-19. He simultaneously argues that he should be released based upon a risk of complications should he be infected, yet refuses the measure that would provide him with the greatest protection from infection. The increased risk of complications defendant faces as a result of his medical condition do not constitute an extraordinary and compelling reason to consider a sentence reduction given defendant's refusal to take advantage of the most significant opportunity available to mitigate or even eliminate such risk.

**2. Release would not be consistent with the sentencing factors set forth in § 3553(a).**

Even had defendant established an extraordinary and compelling reason to consider a sentence reduction, pursuant to the statute, the Court would first need to consider whether those reasons warrant a reduction in light of the relevant § 3553 factors before doing so. Thus the Court must also consider the pertinent § 3553(a) factors, including defendant's history and characteristics, the risk of recidivism he poses, the need to provide medical care in the most effective manner, the time remaining on his sentence, the quality of his release plan, and the impact of the BOP's efforts to maintain the safety of inmates, as well as whether defendant poses a danger to the community. As discussed below, these factors demonstrate that early release is not warranted in this case. *See, e.g., United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (affirming the denial of a motion for compassionate release even where the court found extraordinary and compelling reasons based on the defendant's

advanced-stage liver cancer, but still denied the motion because the § 3553(a) factors weighed against release); *United States v. Cochran*, 2020 WL 2092836, at *4 (N.D. Ind. May 1, 2020) ("Defendant is presently 57 years of age. He is also, by all accounts, largely wheelchair-bound and blind. However, the court, having interacted with defendant during trial and via defendant's extensive filings, is not convinced that these impairments have affected defendant to such an extent that he could not continue to orchestrate criminal activities upon release.").

Defendant's offense was serious. Trafficking heroin and cocaine is inherently dangerous to the community. Here, in addition to trafficking wholesale amounts of cocaine and heroin, defendant possessed a firearm to possess his supply and proceeds, exponentially increasing the dangerousness of his conduct.

Moreover, defendant has a lengthy criminal history. His history includes a conviction for delivery of a controlled substance. While he was on probation for that offense, he was charged with, and subsequently convicted of, aggravated discharge of a firearm. PSR ¶ 51.

Defendant argues that his sentence was more severe than others who were charged in the same criminal complaint that led to his arrest. As an initial matter, this argument ignores that defendant's conduct and criminal history were more serious. Defendant was one of the few defendants charged with possessing a firearm in furtherance of a drug trafficking crime, and the only defendant charged with that crime, who was a career offender. Sentences for other defendants charged with a 924(c) violation were commensurate with defendant's sentence:

- Daniel Vazquez, who was not a career offender, was sentenced to 198 month's imprisonment. 13 CR 744, Dkt. 228.
- Anwer Shabaz, a cooperating defendant who was not a career offender, was sentenced to 135 months' imprisonment, 13 CR 744, Dkt. 245
- Angel Perez, who was not a career offender, was sentenced to 124 month's imprisonment. 13 CR 744, Dkt. 138.
- Francisco Mireles, a cooperating defendant who was not a career offender, was sentenced to 119 months' imprisonment. 13 CR 744, Dkt. 233.

The Court considered defendant's arguments in mitigation at sentencing and imposed a sentence of 150 months, far less than the Guidelines range of 260 to 327 months, and just above the range of 117 to 131 months that defendant would have faced were he not a career offender. The sentence was imposed after the court appropriately considered all of the § 3553 factors.

In any event, challenges to sentences are neither extraordinary nor compelling; to the contrary, Congress has established specific mechanisms for advancing them, which defendants routinely employ. Such challenges are properly brought, if at all, on direct or collateral review, subject to the substantive and procedural limits that govern those avenues of relief. Nothing in § 3582(c)(1)(A) or the relevant policy statement and accompanying application notes—which as *Gunn* recognized, "provide a working definition of "extraordinary and compelling reasons"—even remotely suggests that compassionate release may be granted based on a reassessment of the appropriate criminal penalty for the original criminal conduct.

In sum, release at this time would deprecate the seriousness of defendant's offense, undermine the sentence's purposes of deterrence and protection of the public, and create a danger to the community.

## III. CONCLUSION

For the reasons set forth above, defendant's motion should be denied.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: *s/ Scott M. Edenfield*
SCOTT M. EDENFIELD
Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604

Dated: January 22, 2021